UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ANDREW MACK JOHNSON, JR.,

        Petitioner,               Case No. 1:21-cv-549

v.                                          Honorable Paul L. Maloney

BRYAN MORRISON,

        Respondent.
_____/

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Andrew Mack Johnson, Jr., is incarcerated with the Michigan Department of Corrections at the Lakeland Correctional Facility (LCF) in Coldwater, Branch County, Michigan. On January 31, 2018, following a nine-day jury trial in the Eaton County Circuit Court, Petitioner was convicted of safe-breaking, in violation of Mich. Comp. Laws § 750.531, and first-degree murder, in violation of Mich. Comp. Laws § 750.316. On March 20, 2018, the court sentenced Petitioner to prison terms of 7 years to 33 years, 4 months, for safe-breaking and life imprisonment without parole for first-degree murder.

On June 2, 2021, Petitioner signed his § 2254 petition and placed it in the prison mailing system. The habeas corpus petition raises two grounds for relief, as follows:

    I.    Defendant's home was illegally searched due to an unlawful search warrant based on a defective affidavit, in violation of the Fourth Amendment of the United States Constitution. Thus, the evidence collected is inadmissable [sic] at trial.

    II.   Trial counsel was ineffective where they failed to challenge the validity of the search warrant and the veracity of the affidavit.

(ECF No. 1, PageID.24, 47.) Respondent asserts that Petitioner's first ground for relief is procedurally defaulted, not cognizable, and ultimately meritless, and that his second ground for relief lacks merit. (ECF No. 9.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, dismiss his petition for writ of habeas corpus.

## Discussion

I.   **Factual Allegations**

The Michigan Court of Appeals described the facts underlying Petitioner's prosecution as follows:

> [Petitioner's] convictions arise from the murder of John Abraham, Sr., in his home in Delta Township on July 4, 2016. The victim's son, John Abraham, Jr. (Junior), testified that he has cerebral palsy and requires assistance in all aspects of daily living. He has caregivers 18 hours per day, and has six to eight varying caregivers at a time. The victim and Junior would talk on the phone between 8:30 and 9:00 a.m. each day, and the victim would visit daily from 2:30 p.m. to 5:00 p.m. when no caregivers were scheduled. Both the victim and Junior liked to have cash on hand, and the victim kept Junior's cash in envelopes in drawers at the victim's home. The two often discussed finances and had discussions about money in the presence of Junior's caregivers. Dymond Squires was a regular caregiver from October 2012 until February 2016, and thereafter worked as needed. Squires had been to the victim's home with Junior on one occasion during the summer of 2013. The victim's brother, Robert, also testified that he talked to the victim every day.
>
> When the victim did not telephone Junior on the morning of July 5, 2016, Junior became concerned. When he did not come to Junior's house in the afternoon, Junior's caregiver drove him to the victim's home around 2:00 p.m., but the victim did not answer the door or respond to Junior's yells. Junior telephoned Robert, who went to the victim's home, but the victim did not answer the door. Junior next telephoned his cousin, Lori Gidley, around 4:00 or 5:00 p.m. Lori and her husband, Warren, went to check on the victim. They discovered that the front door was unlocked, and when Warren opened the door he saw a body a few feet from the door. They noticed an indentation on the right side of the victim's head and thought that the victim had possibly fallen and hit his head on a credenza. They assumed the body was the victim, but his face was unrecognizable. Lori called 911.
>
> Eaton County Deputy Andrew Jenkins was among the first responders to the call. He immediately realized that the victim's injuries did not appear to have been caused by a fall. The victim was positioned five feet inside the door and was lying

on his back, he was bleeding heavily from the head and neck, and he had two large slits to his neck; there was brain matter on the carpet. A serrated knife was sticking out from under the victim's body. Deputy Jenkins cleared the house and performed a quick search before paramedics went inside.

After the paramedics entered the home, Deputy Jenkins did a more deliberate walkthrough. There were no signs of forced entry. There were several open kitchen cabinets and drawers. A broken screwdriver was observed in the back bedroom and a safety deposit box was on the bathroom counter. Deputy Jenkins discovered that a safe had been broken open in the basement. In powder that appeared to be from the fire-retardant material lining the safe, Jenkins observed two sets of shoe prints—one larger and one smaller, with two different patterns. Jenkins also observed a hatchet cover on a shelf. As a result of the initial scene investigation, Detective Theodore Johnson determined that there were at least two suspects involved in the crimes and, given the differing size of the shoe prints, he believed one was male and one was female.

The Eaton County Medical Examiner, Dr. Michael Markey, performed an autopsy on the victim on July 6, 2016. Dr. Markey testified at [Petitioner's] trial that the victim's injuries were mainly to the head and neck; he explained the injuries using seven autopsy photographs. The victim suffered multiple blunt force blows to his head from an item such as a bat or hammer and sharp force injuries to his neck. The victim had obvious multiple skull fractures, the skull was fragmented, and parts of the brain were lacerated. Dr. Markey opined that the cause of death was blunt and sharp force injuries to the head and neck and that the manner of death was homicide. He explained that significant force was required to cause the injuries. On July 7, Dr. Markey asked Dr. Joseph Hefner, an assistant professor of anthropology at Michigan State University, to assist in determining timing of injury and mechanism of injury because of the extensive fragmentation of the skull. Dr. Hefner reconstructed most of the skull using the 85 fragments supplied by Dr. Markey. He located 11 blunt force injuries and said that the deformation of the skull was indicative of being struck by a small circular to ovoid implement, such as a hammer, traveling 2,200 feet per second.

Detective Johnson testified that he learned during interviews with Lori Gidley and Junior that the victim was paranoid, that Junior had multiple caregivers, and that the caregivers likely knew that the victim had a lot of cash in his home. Because the victim's house was not ransacked and there was no sign of forced entry, and because the caregivers were aware of the cash in the victim's home, Detective Johnson believed that the motive for the murder was money, the victim was a target, and that one of the caregivers was likely involved.

Subsequently, Detective Johnson interviewed between 15 and 18 of Junior's caretakers and collected DNA from all of them. His interview with Squires on July 8 raised his suspicion that Squires had knowledge of, or involvement in, the crimes, and so he interviewed her a second time. Detective Johnson learned that Squires had a boyfriend, but he did not know the boyfriend's name. After Squires failed a

3

polygraph examination and was interviewed by the polygraph examiner on July 21, 2016, officers began surveillance on Squires that day. By this time, Johnson had met with Dr. Hefner and, based on what he learned from Dr. Hefner, believed a hammer was used to cause the victim's head injuries.

During surveillance, officers observed Squires drive to a residence on Aurelius Road in Lansing and then leave the residence with a larger male. The two got into a red Kia that was parked in the driveway and drove off with Squires driving. The Kia drove to a Meijer parking lot and was observed "cleaning," which is a series of turns or other unusual driving maneuvers in an attempt to determine if the vehicle is being followed. The evasive behavior was significant to Detective Johnson because Squires and a larger accomplice were suspects in the murder.

A search warrant was obtained the same day for the Aurelius Road residence to search for proof of residency and for shoes matching the shoe prints from the victim's basement. Squires and [Petitioner] were present inside the residence and were both detained while officers executed the search warrant. During the search, two different sizes of shoes, one larger and one smaller were found in the bedroom. The shoes had soles with patterns similar to the shoe prints left in the powder in the victim's basement. Two hammers were also found. One of the hammers was found on the top shelf of a closet, and the hammers were the only tools found in the residence.

While the search was ongoing, detectives interviewed Kyara Gendreau, Squires' and [Petitioner's] roommate. Gendreau said that unbeknownst to her, Squires had not been paying rent, and that she learned from the landlord after July 5 that the rent had been paid up-to-date. She also said that after July 5 there was a new air conditioner and a lot of alcohol and "weed" in the home, and someone had been hired to clean the basement. The landlord, Paulina Rodriguez, testified that Squires sent her a text message at 8:20 a.m. on July 5, 2016, informing her that the overdue rent was being paid. A cash deposit of $3,125, the exact amount of rent owing, was deposited into her credit union account by Squires.

During the search of the Aurelius Road residence, an amended search warrant was obtained for Squires' car and for additional items inside the residence. During that search, firearms and a large amount of cash bundled in hair ties were found in the trunk.

On July 23, 2016, while [Petitioner] was being detained for the victim's murder, Detective Johnson met with [Petitioner] to execute a DNA search warrant. During the execution of the warrant, [Petitioner] asked about the investigation. Detective Johnson testified that he read [Petitioner] his *Miranda* rights. [Petitioner] waived his *Miranda* rights and, during a three-hour recorded interview, [Petitioner] described his and Squires' plans to rob the victim, made statements about their poor economic situation, made statements about his involvement in the theft and murder, and said that he and Squires had stolen nearly $30,000 from the victim's safe. [Petitioner] asserted that Squires caused the victim's injuries and he attributed the

4

>murder to her. He said that Squires had a hammer and that he came out of the basement to find her holding the hammer and saying that she struck the victim four or five times. [Petitioner] also said that Squires slit the victim's throat twice and struck him in the head with a crowbar. [Petitioner] said that after cleaning up the scene, he and Squires went home, put their clothes and shoes into a bag, and then went to an apartment complex to dispose of them in a dumpster. Next, they drove to the river near Olympic Broil in north Lansing and threw the instruments used during the crime into the river. According to Detective Johnson, a dive team recovered a hatchet and a knife from the area where [Petitioner] said the instruments were disposed. The Michigan State Police Crime lab matched the tool mark on the hinge area of the safe to the hatchet recovered from the river.
>
>Zachary Burns, a Michigan Department of Corrections inmate, testified that while he was lodged in the Eaton County jail [Petitioner] told him that he went into a man's house with Squires, punched him, and knocked him out. [Petitioner] told him that the man saw his face so he had to kill him with a hammer hit to the head. [Petitioner] said that he then took money from a safe in the basement and that when he came back upstairs he thought the man was still moving so he used a knife to cut the man's throat.
>
>Detective Aaron Roberts analyzed the cell phones retrieved during the search of the Aurelius Road residence. He said that on June 8, 2016, [Petitioner's] phone performed a search for "silencers," and on June 9 it performed a search for silencers and "how to break into a house." On June 10, [Petitioner's] phone performed a search for "how to break into a house quietly." On June 13 and 14, there were searches for "definition of homicide." Squires' phone contained a search for "break a neck by hand." Location services was turned "on" on Squires' phone, and the analysis of the locations where her phone traveled between 8:41 p.m. on July 5 and 5:12 a.m. on July 6 was consistent with the version of events provided by [Petitioner] in his confession.

*People v. Johnson*, No. 343497, 2020 WL 970678, at *1–4 (Mich. Ct. App. Feb. 27, 2020) (footnotes omitted).

Prior to trial, Petitioner filed a motion to suppress the statements he made while in police custody, asserting that the police lacked probable cause to arrest him and that the police did not advise him of his *Miranda* rights upon arrest. (ECF No. 10-7, PageID.532–35.) The trial court denied Petitioner's motion following a hearing held on January 2, 2018. (*Id.*, PageID.601–02.)

The jury heard testimony over the course of nine days from numerous individuals, including the victim's son and brother, other relatives of the victim, a number of police officers

5

and detectives, a forensic pathologist, a forensic anthropologist, and an inmate who was incarcerated with Petitioner. (ECF Nos. 10-10, 10-11, 10-12, 10-13, 10-14, 10-15.) The jury deliberated for almost a full day before reaching its verdict. (ECF No. 10-17.) The court sentenced Petitioner to mandatory life imprisonment on March 20, 2018. (ECF No. 10-18.)

Petitioner, with the assistance of counsel, appealed his conviction and sentence, raising the following issues: (1) the trial court erred by denying his motion to suppress; (2) the trial court erred by failing to initially instruct the jury that aiding and abetting applies to first-degree premeditated murder; (3) the prosecutor committed misconduct by vouching for the credibility of Burns and by asking the jury to sympathize with the victim and his family; (4) the trial court erred by admitting into evidence the autopsy photographs, and that trial counsel was ineffective for stipulating to their admission; and (5) the first search warrant lacked probable cause. *See Johnson*, 2020 WL 970678, at *4–11. On February 27, 2020, the Michigan Court of Appeals affirmed Petitioner's conviction and sentence. *Id.* at *1. Petitioner then filed a *pro per* application for leave to appeal to the Michigan Supreme Court. On November 4, 2020, the Michigan Supreme Court denied Petitioner's application for leave to appeal. (ECF No. 10-21, PageID.2665.) This § 2254 petition followed.

## II. AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example,

8

if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

**III. Discussion**

As noted above, Petitioner raises two grounds for relief: (1) that his home was illegally searched because of an unlawful search warrant based on a defective affidavit, in violation of the Fourth Amendment, and that trial counsel was ineffective for failing to challenge the validity of that warrant and the veracity of the affidavit. (ECF No. 1, PageID.24, 47.) Petitioner's first ground for relief, his Fourth Amendment claim, is barred by the doctrine set forth in *Stone v. Powell*, 428 U.S. 465 (1976). *See also Queen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996) (noting that it is well-settled that *Stone* bars Fourth Amendment claims). In *Stone*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *Id.*; *see also Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012).

For the rule of *Stone* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986); *Markham v. Smith*, 10 F. App'x 323, 326 (6th Cir. 2001).

In the instant case, Petitioner acknowledges that he cannot satisfy either prong of the *Stone v. Powell* standard. (ECF No. 1, PageID.25.) It is beyond dispute that Michigan has a state

9

procedural mechanism that presents a defendant a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures. *See People v. Margelis*, 186 N.W. 488 (Mich. 1922). After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts consistently have acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment. *See, e.g.*, *People v. David*, 326 N.W.2d 485, 488 (Mich. Ct. App. 1982). Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, to satisfy the remaining prong of *Stone v. Powell*, Petitioner must allege facts showing that the state corrective mechanism has somehow broken down. *See, e.g.*, *Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court completely ignored Fourth Amendment claim). The Sixth Circuit pointedly has held that the doctrine of *Stone v. Powell* applies, even if the federal court deems the state-court determination of the Fourth Amendment claim to have been in "egregious error." *Gilbert*, 763 F.2d at 824 (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)).

Petitioner has not alleged any facts showing that the state's mechanism has broken down. Rather, Petitioner argues that counsel was ineffective for failing to challenge the validity of the search warrant and the veracity of the affidavit supporting it. That, however, raises a separate ineffective assistance of counsel claim; it does not suggest that the state's mechanism for addressing Fourth Amendment claims has broken down. Indeed, the Michigan Court of Appeals gave Petitioner's Fourth Amendment claim full and proper consideration and determined that it lacked merit. Petitioner raised the issue again in his application for leave to appeal to the Michigan

Supreme Court, which denied his application. Even if this Court were to disagree with the determination of the Michigan courts, that disagreement would be insufficient to satisfy the second prong of the Sixth Circuit standard. *See Gilbert*, 763 F.2d at 824.

Because Petitioner has failed to demonstrate either prong of *Stone v. Powell*, his first ground for relief, asserting illegal search and seizure, is barred on habeas review. The merits of Petitioner's Fourth Amendment challenge, however, become relevant despite *Stone* because of Petitioner's related ineffective assistance of counsel claim. In *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the Supreme Court stated: "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Id.* at 375. For that reason, the Court will review the Michigan Court of Appeals' analysis of Petitioner's Fourth Amendment claim under the AEDPA standard.

The Michigan Court of Appeals resolved Petitioner's Fourth Amendment claim as follows:

> In a Standard 4 brief, [Petitioner] argues that the affidavit in support of the first search warrant contained false statements that were made in reckless disregard of the truth, without which, probable cause to issue the search warrant would have been lacking. [Petitioner] further argues that because the false statements supply the only facts sufficient for a finding of probable cause, the warrant is fatally defective and the resulting search warrant is invalidated. Suppression of all evidence obtained as a result is appropriate and the good-faith exception does not apply. Moreover, the additional search warrants obtained as a result of the execution of the initial search warrant are unlawful. Because [Petitioner] did not challenge the validity of the search warrant in the trial court, this issue is not preserved, and our review is limited to plain error affecting [Petitioner's] substantial rights. [*People v.*] *Carines*, 460 Mich. [750,] 762–763 [(1999)].
>
> A search warrant may only be issued upon a showing of probable cause. U.S. Const., Am. IV; Const. 1963, art. 1, § 11; MCL 780.651(1). "Probable cause sufficient to support issuing a search warrant exists when all the facts and circumstances would lead a reasonable person to believe that the evidence of a crime or the contraband sought is in the place requested to be searched." *People v. Ulman*, 244 Mich. App. 500, 509; 625 N.W.2d 429 (2001) (quotation marks and

11

citation omitted). The magistrate's finding of probable cause must be based on the facts related within the affidavit. MCL 780.653; *Ulman*, 244 Mich. App. at 509. A defendant may be entitled to have a warrant voided when the warrant affiant's statements were deliberately false or made in reckless disregard for the truth and the affidavit's remaining content is insufficient to establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 156; 98 S. Ct. 2674; 57 L. Ed. 2d 667 (1978). The burden rests on the defendant to establish by a preponderance of the evidence that the affidavit contains a reckless or deliberate falsehood and that with this material "set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156.

[Petitioner] argues that two statements in the search warrant are false: (1) that in an interview of Squires conducted on July 21, 2016, she made statements suggesting she was involved in the crime, and (2) that Squires stated to the polygraph examiner, MSP Detective-Sergeant Derrick Jordan, "that she did not know everything and that was all she was going to say at this point." According to the affiant, Detective Aaron Roberts, these statements were related to him by Detective Johnson.

Since Detective Roberts was stating what he was told by Detective Johnson, [Petitioner] has failed to make any showing that the *affiant's* statements were deliberately false or ma[d]e in reckless disregard of the truth. And, as the Supreme Court emphasized in *Franks*, 438 U.S. at 171, "[t]he deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant." Therefore, if Detective Johnson, who observed the interview, did not accurately convey Squires' statements to the affiant, or if the affiant carelessly misrepresented what he was told, [Petitioner] has failed to establish *deliberate* falsity or *reckless* disregard for the truth.

Further, even if those two statements are eliminated from the warrant affidavit, there was still "sufficient content in the warrant affidavit to support a finding of probable cause." *Franks*, 438 U.S. at 172. The initial search warrant affidavit that [Petitioner] challenges sought a search warrant to discover documentation that would show occupancy of the residence to which they had followed Squires after the interview. It also sought the right to discover and seize "[s]hoes, boots, and other footwear." The affidavit described how the police had followed Squires after the interview as she drove directly to the address they sought to search. It then described how Squires subsequently emerged from the home with an unknown male and an unknown female; the male was described as being larger than the female. The affidavit then described how Squires drove away in an "erratic fashion" and apparently attempted to elude anyone who might be following her. The affidavit then described a series of facts about the victim's possession of a large amount of cash in a safe in his house: the victim's son had told his caregivers that the victim had a large amount of money in his house; that Squires' telephone number was listed in the contacts list of the victim's cell phone; that Squires was one of the son's caregivers; that Squires had admitted that she had been in the victim's home; that footwear impressions were found in the dust from the safe's

12

> fire-retardant lining that was found on the floor around the safe; and that one of the prints was larger than the other one—indicating that the robbery had been committed by two separate individuals. The police thus sought entry to the subject home to find footwear that might have been worn during the robbery/murder. These stated facts were sufficient to establish probable cause to suspect that footwear worn by the murderer(s) might be found int the subject home. Thus, even if the two challenged allegations of the affiant are removed, the remainder of the allegations established sufficient probable cause to support the search warrant.

*Johnson*, 2020 WL 970678, at *10 (footnote omitted).

In his § 2254 petition, Petitioner again takes issue with the statements considered by the Michigan Court of Appeals. (ECF No. 1, PageID.28.) He contends that these statements "were made in reckless disregard for the truth and without them there could not have been a finding of probable cause to issue the search warrant." (*Id.*) Petitioner faults the court of appeals for "never address[ing] the veracity of the alleged false statements." (*Id.*, PageID.31.) He avers that "with the alleged false statements stricken from the initial affidavit, the remainder of the affidavit is based off of mere suspicion." (*Id.*, PageID.34.) Petitioner further argues that the affidavit failed to set forth facts connecting Squires or the murder to Petitioner's home and, therefore, failed to set forth a sufficient nexus between the place to be searched and the alleged crime. (*Id.*, PageID.37–38.)

A review of the record indicates that Petitioner simply repeats the arguments regarding the veracity of the statements that he raised to the court of appeals. (ECF No. 10-20, PageID.2526–31.) Petitioner, however, fails to explain how the court of appeals' determination is contrary to, or an unreasonable application of, clearly established federal law. The court of appeals' analysis expressly relies upon *Franks v. Delaware*—relevant Supreme Court authority and clearly established federal law. There is nothing in the court of appeals' analysis, and nothing in Petitioner's submissions, that suggests that the court of appeals applied *Franks* unreasonably.

As noted above, Petitioner never raised any argument asserting that the search warrant affidavit failed to set forth a sufficient nexus to the court of appeals. A search warrant affidavit

13

"must indicate a nexus between the place to be searched and the evidence sought and this nexus may be established by the nature of the items and normal inferences of where a person would keep such items." *United States v. Hawkins*, 278 F. App'x 629, 634 (6th Cir. 2008). The affidavit in question sought a search warrant to find evidence of occupancy of the house, as well as "[s]hoes, boots, and other footwear." (ECF No. 10-20, PageID.2574.) The affidavit indicated that Squires had made statements "suggesting she was involved in the crime" during her interview, that a detective witnessed Squires drive to the residence in question, and that footwear impressions from at least two individuals were found in the dust left from the safe's fire-retardant material. (*Id.*, PageID.2574–75.) The affidavit thus set forth a sufficient nexus between the place to be searched and the evidence sought.

Building on its conclusion regarding Petitioner's Fourth Amendment argument, the court of appeals also rejected Petitioner's ineffective assistance claim:

> Finally, [Petitioner] argues that his trial counsel's failure to challenge the validity of the warrant and the veracity of the affidavit constituted ineffective assistance. However, because [Petitioner] has failed to establish any invalidity in the warrant affidavit, and because there is sufficient probable cause even if the challenged statements are stricken from the affidavit, there is no valid claim of ineffective assistance of counsel, as there is no possible outcome-determinative error.

*Johnson*, 2020 WL 970678, at *11.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel*, 350 U.S. at 101); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court recently has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010)). Because the standards under both *Strickland* and § 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

While the court of appeals' determination of the ineffective assistance claim did not cite to any case law, its determination is entirely consistent with *Strickland*. The Michigan Court of Appeals determined that counsel's failure to challenge the validity of the warrant was not ineffective assistance because the warrant was not, in fact or law, invalid. *People v. Johnson*, 2020 WL 970678, at *11. Put differently, the challenge that Petitioner claims his counsel failed to make was meritless. As the Sixth Circuit has noted, "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

The Michigan Court of Appeals, however, did not address the matter in terms of the *Strickland* test; it addressed the matter using language typically associated with "harmless error" analysis. Under Michigan harmless error jurisprudence, unpreserved nonstructural constitutional error is reviewed under a plain error standard. *People v. Cornell*, 646 N.W.2d 127, 142–43 (Mich. 2002); *People v. Carines*, 597 N.W.2d 130, 143 (Mich. 1999). To prevail, the defendant must show "a plain error that affected substantial rights." *Carines*, 597 N.W.2d at 143. The Michigan Supreme Court assesses whether the error affected the outcome of the proceeding to determine whether the defendant has made the necessary showing. *People v. Davis*, __ N.W.2d __, 2022 WL 779132, at *11 (Mich. Mar. 14, 2022) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). That is "the same kind of inquiry" the Michigan courts use to determine whether error is harmless: was it "outcome-determinative." *Id*. The Michigan Supreme Court equates "outcome determination" to "prejudice" when separating plain from harmless error, *People v. Vaughn*, 821 N.W.2d 288, 303 (Mich. 2012), and when evaluating the *Strickland* standard for ineffective assistance of counsel, *People v. Harris*, 840 N.W.2d 307, 308 (Mich. 2013).

The impact of an error on the outcome of the proceedings is also the focus of federal harmless error analysis. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting as the standard for determining whether habeas relief if appropriate "whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'"); *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (posing the question as "'Do I, the judge, think that the error substantially influenced the jury's decision?'"); *Brown v. Davenport*, __ S.Ct. __, 2022 WL 1177498, at *5 (Apr. 21, 2022) (stating "a state prisoner . . . must show that the error had a 'substantial and injurious effect or influence' on the outcome of his trial."). The appellate court's decision that the error was not outcome determinative, a determination to which this Court must

defer,[1] is the equivalent of a determination that the error was harmless under *Brecht*. *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995). The determination that any error was harmless under *Brecht* necessarily means that it is not prejudicial under *Strickland*. *See Kyles*, 514 U.S. at 436 (explaining that the *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), materiality standard, later adopted as the prejudice standard for ineffective assistance of counsel claims, requires the habeas petitioner to make a greater showing of harm than is necessary to overcome the harmless error test of *Brecht*); *see also Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016) ("[O]ur previous analysis of *Strickland* prejudice applies to the assessment of whether the Confrontation Clause violation was harmless error under *Brecht*."); *Bell v. Hurley*, 97 F. App'x 11, 17 (6th Cir. 2004) ("Because we find the error to be harmless [under *Brecht*] Bell cannot meet the prejudice requirement of *Strickland*. . . ."); *Kelly v. McKee*, No. 16-1572, 2017 WL 2831019 at *8 (6th Cir. Jan. 24, 2017) ("Because Kelly suffered harmless error [under *Brecht*] at best, he cannot establish that he suffered prejudice [under *Strickland*]."). Thus, once the Court defers to the determination that any error was not outcome determinative, it necessarily follows that Petitioner cannot establish prejudice under *Strickland* for counsel's failure to persuasively raise the issue.

Petitioner, therefore, has failed to demonstrate that the court of appeals' rejection of his ineffective assistance claim relating to counsel's failure to challenge the search warrant and accompanying affidavit is contrary to, or an unreasonable application of, clearly established federal law.

---

[1] *Brown* states that "a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA." 2022 WL 1177498 at *6. Accordingly, the Court must defer to that adjudication under § 2254(d)(1) unless the "petitioner persuades [the Court] that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Id*. at *9. This is a standard that is intentionally difficult to meet. *See Woods*, 575 U.S. at 316.

## IV. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated:　May 11, 2022　　　　　　　　　　　　/s/ Paul L. Maloney
　　　　　　　　　　　　　　　　　　　　　　Paul L. Maloney
　　　　　　　　　　　　　　　　　　　　　　United States District Judge